**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: THE RESIDENCE LOCATED AT 47763 BLOCKHOUSE POINT PLACE, STERLING, VA, AND DAPHNE KASPEREK AND THOMAS KASPEREK, INCLUDING ANY AND ALL MOBILE DIGITAL DEVICES OWNED, USED, OR CONTROLLED BY DAPHNE KASPEREK OR THOMAS KASPEREK | Case No. 1:24-sw-195 <br><br> UNDER SEAL |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR SEARCH WARRANT

I, Ashley Roberts, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for two warrants to search and seize as follows:

    a.   The premises located at 47763 Blockhouse Point Place, Sterling, VA (the "PREMISES"), further described in Attachment A-1, for the things described in Attachment B.

    b.   The persons THOMAS KASPEREK AND DAPHNE KASPEREK, as described in Attachment A-2, for things described in Attachment B.

2.      Unless otherwise noted, wherever a statement is made in this affidavit, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit statements are quoted, those quotations have been taken from draft transcripts, which are subject to further revision.

3. Unless otherwise stated, the conclusions and beliefs expressed in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation.

## AFFIANT BACKGROUND

4. I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Washington Field Office, Joint Terrorism Task Force ("JTTF"). In my duties as a Special Agent on the JTTF, I investigate criminal violations including crimes against children, violent crime, and domestic terrorism. I have personally participated in procuring and executing arrest warrants of persons committing federal violations and search warrants involving the search and seizure of multiple types of evidence, to include electronic communications, digital devices, social media accounts, cell site data, and geolocation data. Currently, I am tasked with investigating criminal activity in and around the Capitol grounds on January 6, 2021. As an FBI Special Agent, I am authorized by law or by a Government agency to engage in or supervise the prevention, detection, investigation, or prosecution of a violation of Federal criminal laws.

5. The facts of this affidavit come from my review of the evidence, my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. This affidavit merely intends to show that sufficient probable cause exists for the requested warrants and does not set forth all of my knowledge about this matter.

2

6.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 231 (civil disorder), 1752(a)(1) (entering or remaining in restricted buildings or grounds), 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds); and 40 U.S.C. §§ 5104(e)(2)(D)(disorderly or disruptive conduct in the Capitol Buildings), and 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol Building) (the "TARGET OFFENSES") have been committed by THOMAS and DAPHNE KASPEREK and other identified and unidentified persons, including others who may have been aided and abetted by THOMAS and DAPHNE KASPEREK, or conspiring with THOMAS and DAPHNE KASPEREK, as well as others observed by THOMAS and DAPHNE KASPEREK.  There is also probable cause to search the PREMISES, as described in Attachment A-1, and THOMAS AND DAPHNE KASPEREK, as described in Attachment A-2, for the things described in Attachment B.

## **PROBABLE CAUSE**

### *Background – The U.S. Capitol on January 6, 2021*

7.     U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred on January 6, 2021, at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510.

8.     The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.     On the west side of the Capitol building is the West Front, which includes the

3

inaugural stage scaffolding, a variety of open concrete spaces, two staircases, and multiple terraces. On the east side of the Capitol is the East Front, which includes three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and closed to members of the public on January 6, 2021.

10.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately 1:00 p.m. Eastern Standard Time in the House of Representatives. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

11.     The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in Title 18, United States Code, Section 1752 due to the fact that the Vice President and the immediate family of the Vice President, among others, would be visiting and did visit the Capitol complex that day.

12.     At around 1:00 p.m., individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol. As a result of these and other similar actions by the crowd, the situation at the Capitol became a civil disorder as that term is used in Title 18, United

4

States Code, Section 231. The civil disorder obstructed the ability of the U.S. Secret Service to perform the federally protected function of protecting Vice President Pence.

13.     As they advanced unlawfully onto Capitol grounds and towards the U.S. Capitol building over the next several hours, individuals in the crowd destroyed barricades and metal fencing and assaulted law enforcement officers with fists, poles, thrown objects, and chemical irritant sprays, among other things. Individuals in the crowd carried weapons including tire irons, sledgehammers, bear spray, and tasers, some of which were also used to assault members of law enforcement. A number of individuals in the crowd wore tactical vests, helmets, and respirators.

14.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.

15.     Beginning shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement.

16.     Once inside, certain of the unlawful entrants destroyed property, stole property, and assaulted federal police officers.

17.     Between approximately 2:10 p.m., and 2:30 p.m., Vice President Pence evacuated the Senate Chamber, and the Senate and House of Representatives went into recess. Unlawful entrants into the U.S. Capitol building attempted to break into the House chamber by breaking the windows on the chamber door. Law enforcement officers inside the House of Representatives drew their weapons to protect members of the House of Representatives who were stuck inside. Both

the Senate and the House of Representatives Chamber were eventually evacuated.

18.     At around 2:47 p.m., subjects broke into the Senate Chamber not long after it had been evacuated.

19.     At around 2:48 p.m., DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. Mayor Bowser's order imposing a curfew in the District of Columbia impacted interstate commerce. For example, grocery store Safeway closed all 12 of its stores in the District of Columbia as of 4 p.m. that day, and Safeway's stores were supposed to close at 11 p.m.

20.     At about 3:25 p.m., law enforcement officers cleared the Senate floor. Between 3:25 and around 6:30 p.m., law enforcement was able to clear the U.S. Capitol of all of the subjects.

21.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening, the joint session could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol throughout the events, including during the time he was evacuated from the Senate Chamber until the joint session concluded at approximately 3:44 a.m. on January 7, 2021.

22.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of

6

violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

23.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

24.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

### Facts Specific to this Application

25.     On January 13, 2021, the FBI received a tip from a tipster ("CW-1") regarding an individual named Thomas Kasperek (hereinafter "Thomas").  On January 5, 2024, I spoke with CW-1 via telephone and another tipster ("CW-2), both of whom personally know the Kaspereks. CW-1 provided information on Thomas's involvement on January 6, 2021, specifically stating that Thomas went to the U.S. Capitol.  CW-1 also provided information regarding Thomas's wife,

Daphne Kasperek (hereinafter "Daphne").  Although the tipster did not know if Daphne took part in the Capitol riot on January 6, 2021, CW-1 conveyed that Daphne and Thomas shared similar ideologies.

26.     CW-2 confirmed the information provided by CW-1 and stated that Thomas and Daphne were both present at the Capitol on January 6, 2021.  CW-2 also informed me that Thomas believes the November 2020 Presidential election was stolen.

27.     Additionally, on January 22, 2024, I sent CW-1 screenshots from Capitol Closed Circuit Video ("CCV") on January 6th (see below).  CW-1 identified the individual in the photos as Thomas Kasperek.

       

*Figures 1A and 1B: Thomas Kasperek on January 6, 2021*

28.     The FBI compared Thomas's Virginia driver's license photo with photos of Thomas from January 6, 2021, and they appear to be the same individual.

29.     Additionally, I showed CW-1 a screenshot of another individual on restricted Capitol grounds on January 6, 2021 (see below).  CW-1 identified the individual as Daphne Kasperek.



*Figure 2: Daphne Kasperek on January 6, 2021*

30.      The FBI also compared Daphne's Virginia driver's license photo with photos of Daphne from January 6th, 2021, and they appear to depict the same individual.

31.     Following the events on January 6, 2021, law enforcement obtained a search warrant for telecommunication provider data pertaining to the geographic area of the Capitol.  The data obtained reflects that the phone numbers associated with Daphne and Thomas Kasperek, *i.e.*, telephone numbers XXX-XXX-4069 and XXX-XXX-8454[1], respectively, were present in the Capitol building during the Capitol riot.

---

[1] These phone numbers are known to law enforcement but are masked for purposes of this affidavit.

32.     Using Capitol CCTV, body-worn camera, and open-source footage, along with the geofencing data and identifications discussed above, the FBI traced the Kaspereks' path through the Capitol grounds and building.

33.     A review of Capitol CCV, body-worn camera ("BWC"), and open-source footage show that Thomas Kasperek wore a red hat, eyeglasses, black puffer style jacket, and dark colored pants, and carried a walking stick while on restricted Capitol grounds on January 6th.  A similar review reveals that Daphne Kasperek wore a red striped beanie, a dark colored face covering, a red scarf, and a blue and grey puffer styled jacket.

34.     CCV shows that Thomas entered the U.S. Capitol at approximately 2:23 p.m. EST through the Senate Wing Door.



*Figure 3: Thomas Kasperek Entering the Capitol*

Daphne entered through the same doors less than a minute later.



*Figure 4: Daphne Kasperek Entering the Capitol*

35.     After entering the building, both Thomas and Daphne Kasperek entered and remained in the Crypt from approximately 2:25 p.m. to 2:31 p.m.



*Figure 5: Thomas and Daphne Kasperek in the Crypt*

36.     At approximately 2:33 p.m., an officer in riot gear who was attempting to clear rioters from the building approached Thomas and directed him towards the Senate Wing Door. Open-source video shows that Thomas verbally engaged with the officers.



*Figure 6: Thomas Kasperek Verbally Engaging with Officers*

37.     Both Daphne and Thomas Kasperek exited the Capitol building through the Senate Wing Doors/Window at approximately 2:35 p.m.

38.     I know, based on my training and experience, that people routinely re-wear clothing and accessories, store these items in their homes, and keep them for an extended period.  Clothing and accessories consistent with those worn by THOMAS and DAPHNE KASPEREK on January 6, 2021, constitute evidence of the offenses discussed herein.

39.     I also know, based on my training and experience, that cellphones are expensive, and people routinely retain their cellphones for many months or years.

12

40.     I also know that hundreds of people have been arrested in connection to the riot that occurred at the U.S. Capitol on January 6, 2021. During searches of many of those people's residences, from early 2021 through present, in multiple jurisdictions, law enforcement has recovered clothing, paraphernalia, tools, and devices that were worn, used, or carried on January 6, 2021. Items from the events of January 6, 2021 have been recovered from people's residences from 2021 through the present, including during the last six months. For example:

a.  On November 29, 2023, in the Northern District of Massachusetts, the FBI recovered a window shutter slat stolen from the Capitol as well as a jacket and hat worn on January 6.

b.  On December 12, 2023, in the Eastern District of Tennessee, the FBI recovered black gloves, a grey hoodie, and a backpack—all worn on January 6, 2021.

c.  On December 13, 2023, in the Northern District of West Virginia, the FBI recovered items worn on January 6, 2021, including a camouflage flag, Washington Capitals jersey, and two hats, as well as two Google Pixel phones matching the phone types linked to phones used by the defendant that day.

d.  On December 15, 2023, in the Eastern District of California, the FBI recovered a Trump flag, that was worn by the defendant on January 6, 2021, and a cellphone with photos from January 6, 2021, while the defendant was at the U.S. Capitol.

e.  On January 30, 2024, in the Eastern District of Tennessee, the FBI recovered a black bandana and sunglasses worn by the defendant on January 6, 2021.

     f.   On February 7, 2024, in the Eastern District of Virginia, the FBI recovered a ballistic helmet, tactical vest, and pants worn by the defendant on January 6, 2021, as well as documents concerning the defendant's travel to D.C.

     g.   On February 22, 2024, in the Southern District of Florida, the FBI recovered a hat and scarf that the defendant wore on January 6, 2021, as well as handheld radios that appeared to be the same type used by the defendant on January 6, 2021.

41.    In this case, THOMAS and DAPHNE KASPEREK's phone numbers were captured in geofencing data, and open-source photos and videos show that THOMAS KASPEREK used a cellphone while on restricted Capitol grounds.  Additionally, based on open-source material capturing the riot, numerous persons who committed the TARGET OFFENSES possessed digital devices that they used to record the events and to post photos/videos of themselves and others committing those offenses on social media.

42.    Further, based on the broader Capitol Riot investigation, numerous persons committing the TARGET OFFENSES used digital devices to communicate about their plan to attend the January 6, 2021, to coordinate with other participants the day of, and to communicate and post on social media and digital forums about the events of January 6th after they occurred.

43.    Moreover, it is well-known that virtually all adults in the United States use mobile digital devices. In a fact sheet from April 7, 2021, the Pew Research Center for Internet & Technology estimated that 97% of Americans owned at least one cellular phone, and that that same 2021 report estimated that 85% of Americans use at least one smartphone. *See* Mobile Fact Sheet,

https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited November 27, 2023).

44.     The property to be searched includes any cellphones, laptop computers, and/or tablets owned, used, or controlled by THOMAS and DAPHNE KASPEREK, including but not limited to the cellphones associated with phone numbers XXX-XXX-4069 (DAPHNE) and XXX-XXX-8454 (THOMAS) (hereinafter the "DEVICES").

45.     Investigators have reason to believe that the DEVICES are currently located at the PREMISES because, based on Virginia State Records, THOMAS and DAPNE KASPEREK reside at the PREMISES.

## TECHNICAL TERMS

46.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.   Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

15

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling

16

voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

       c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

       d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special

sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that

18

computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a username or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

19

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.  One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.      When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.      Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

o.      "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the

21

functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

22

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

47.      As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the PREMISES, in whatever form they are found. One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment B are stored on the DEVICES because:

a.      Individuals who engage in criminal activity, including the TARGET OFFENSES, used digital devices to plan and coordinate their travel to Washington, D.C. on January 6, 2021, and their activities while on restricted Capitol grounds.

b.      Individuals who engage in criminal activity, including the aforementioned TARGET OFFENSES, in the event that they changed digital devices, often "back up" or transfer files from old digital devices to that of their new digital devices, so as not to lose data.

c.      Digital device files, or remnants of such files, can be recovered months or even years after downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet

24

pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

48.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information relayed to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on the DEVICES at issue here because:

a.    Although some of the records sought by this application may be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence. Specifically, records of how a digital device has been used, what it has been used for, who used it, and who was responsible for creating or maintaining records, documents, programs, applications, and materials contained on the DEVICES. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the DEVICES, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

      b.    Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

      c.    A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

49.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices –

27

may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

      b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

      c.    Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software

28

requires specialized tools and a controlled laboratory environment, and can require substantial time.

    d.  Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.

A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

      e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cellphones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

      f.    Based on all of the foregoing, I respectfully submit that searching the DEVICES for information, records, or evidence pursuant to this warrant may require a wide array

of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, I request permission to use whatever data analysis techniques appear to be reasonably necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

50.     The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

a.     Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.     Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize the DEVICES that fall within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport the DEVICES to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid

of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2. The analysis of the contents of the DEVICES may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3. In searching the DEVICES, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to decide whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## BIOMETRIC ACCESS TO DEVICE(S)

51.     This warrant permits law enforcement agents to obtain from THOMAS and DAPHNE KASPEREK (but not any other individuals present at the PREMISES at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that THOMAS and DAPHNE KASPEREK's physical biometric characteristics will unlock the Device(s).

52.     In my training and experience, it is likely that cellphones possessed by THOMAS and DAPHNE KASPEREK will have biometric unlocking features, such as fingerprint or facial recognition unlocking.

53.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

54.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once

a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

55.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

56.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

34

57.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

58.     As discussed in this Affidavit, I believe one or more DEVICES will be found during the search. The passcode or password that would unlock the DEVICES subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the Device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

59.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric

35

features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

60.     Due to the foregoing, if law enforcement personnel encounter any DEVICES that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from the aforementioned persons the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the DEVICES, including to (1) press or swipe the fingers (including thumbs) of the aforementioned persons to the fingerprint scanner of the device(s) found at the PREMISES; (2) hold the device(s) found at the PREMISES in front of the face of the aforementioned persons to activate the facial recognition feature; and/or (3) hold the device(s) found at the PREMISES in front of the face of the aforementioned persons to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

61.     The proposed warrant does not require THOMAS and DAPHNE KASPEREK to state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the device(s). Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel THOMAS and DAPHNE KASPEREK to state or otherwise provide that information. However, the voluntary disclosure of such information by THOMAS and DAPHNE KASPEREK would be permitted under the proposed warrant. To avoid confusion on that point, if agents who are executing the

36

warrant ask THOMAS and DAPHNE KASPEREK for the password to any of the DEVICES, or ask THOMAS and DAPHNE KASPEREK to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks the DEVICES, the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

### AUTHORIZATION TO SEARCH DIGITAL DEVICES
### AT ANY TIME OF THE DAY OR NIGHT

62.     Law enforcement personnel will commence the execution of this search and seizure warrant upon the PREMISES during daytime hours (between 6:00 a.m. and 10:00 p.m.), as early as practicable. It is anticipated that law enforcement personnel will attempt to image or copy digital information from certain servers on the PREMISES, rather than remove those servers from the premises. Such onsite imaging or copying will minimize disruptions to the use of those servers.

63.     From my training and experience, I know that imaging or copying information from servers on the PREMISES can be substantially delayed by various factors which cannot be ascertained or sometimes even anticipated until the actual execution of the warrant. There may be, for example, be no system administrator available, willing, or able to assist law enforcement personnel to narrow the search by identifying the virtual or dedicated server(s) on the PREMISES, or the server folders, containing information within the scope of the warrant. There may be terabytes or even petabytes of information to be copied. The network architecture of the servers on the PREMISES or the configuration of the server hardware may affect and delay data transfer speeds. Data encryption and password protections may also significantly delay imaging or copying

37

as law enforcement personnel seek to identify necessary passwords without which imaging or copying on the PREMISES would likely be unachievable. Under some circumstances, data downloads can be interrupted by network or hardware malfunctions or other network or hardware attributes which often necessitates restarting the data downloads from the beginning.

64.     For all of the foregoing reasons, I respectfully submit that good cause exists, pursuant to Fed. R. Crim. P. 41(e)(2)(A)(ii), for authorization to execute the search warrant at any time of the day or night. Law enforcement personnel will commence executing the warrant as near to 6:00 a.m. as practicable. However, given the myriad factors that that may prevent completion of the search and seizure by 10:00 p.m., including those described above, I request authorization to continue the warrant execution past 10:00 p.m., if necessary, until completion of the warrant execution. Suspending the execution at 10:00 p.m. until 6:00 a.m. could compromise data downloads in progress, render stored data subject to alteration or deletion, require securing the PREMISES during the intervening hours, and prolong the disruption of access to, and use of, the PREMISES and the digital devices being searched.

## **CONCLUSION**

65.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A-1 and A-2, and to seize the items described in Attachment B.

Respectfully submitted,

Ashley Roberts
Special Agent
Federal Bureau of Investigation

38

Affidavit submitted by e-mail and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 22nd day of March, 2024.

_____
**William B. Porter**
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

*Property to be searched*

The property to be searched is 47763 Blockhouse Point Place, Sterling, VA (the "PREMISES"), a brick single-family home, approximately 5,500 square foot, with a long drive way, as pictured below:





## **ATTACHMENT A-2**

*Persons to be searched*

The persons to be searched are: Thomas Kasperek, date of birth 01/18/1957, depicted below, as well as any personal property and effects on his person or in his possession, including, but not limited to any cellphones or other electronic devices; and Daphne Kasperek, date of birth 09/05/1965, also depicted below, as well as any personal property and effects on her person or in her possession, including, but not limited to any cellphones or other electronic devices,



*Thomas Kasperek*



*Daphne Kasperek*

## ATTACHMENT B

### *Property to be seized*

1.    The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. §§ 231 (civil disorder), 1752(a)(1) (entering or remaining in restricted buildings or grounds), 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds); and 40 U.S.C. §§ 5104(e)(2)(D) (disorderly or disruptive conduct in the Capitol Buildings) and 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol Building) (the "TARGET OFFENSES") that have been committed by THOMAS and DAPHNE KASPEREK and other identified and unidentified persons, as described in the search warrant affidavit; including, but not limited to:

    a.    Evidence of the TARGET OFFENSES, including but not limited to: geolocation data indicating THOMAS and DAPHNE KASPEREK presence on Capitol grounds on January 6, 2021, pictures/videos showing THOMAS and DAPHNE KASPEREK at the Capitol on January 6th, text messages or Signal messages discussing January 6th, social media messages and/or posts depicting THOMAS and DAPHNE KASPEREK role on January 6th;

    b.    Evidence of any conspiracy, planning, or preparation to commit those offenses;

    c.    Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

    d.    Evidence concerning materials, devices, or tools that were used to unlawfully commit the TARGET OFFENSES;

    e.    Evidence of communication devices used in relation to the TARGET OFFENSES;

f. Evidence of the state of mind of THOMAS and DAPHNE KASPEREK and/or other co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

g. Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

h. Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

i. Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

j. Evidence concerning the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

k. Evidence concerning efforts to obstruct, impede, or disrupt the same;

l. Evidence concerning the breach and unlawful entry of the United States Capitol on January 6, 2021;

m. Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

n. Evidence concerning the assaults of or efforts to impede law enforcement in the performance of their official duties at the United States Capitol on January 6, 2021;

3

o.  Evidence concerning damage to or theft of property at the United States Capitol on January 6, 2021;

p.  Evidence indicating an awareness that the U.S. Capitol was closed to the public on January 6, 2021;

q.  Evidence of THOMAS and DAPHNE KASPEREK presence at the U.S. Capitol on or around January 6, 2021;

r.  Evidence concerning the results of, challenges to, or questions about the legitimacy of the 2020 Presidential Election;

s.  Evidence regarding THOMAS and DAPHNE KASPEREK's travel to Washington, D.C. in or around January 2021, motive and intent for travel to Washington, D.C. in or around January 2021, the planning of travel to and activity in Washington, D.C. on or about January 6, 2021, research about the U.S. Capitol, and mode of travel, travel expenses, and travel logistics on or about January 6, 2021;

t.  Evidence regarding the riot at the U.S. Capitol on January 6, 2021;

u.  Clothing and other items that reflect evidence of THOMAS and DAPHNE KASPEREK's presence at the U.S. Capitol on January 6, 2021;

2.  Records and information that constitute evidence of identity, including but not limited to:

a.  clothing worn by THOMAS and DAPHNE KASPEREK on January 6, 2021, including a red MAGA Hat, red and white beanie, a blue and grey puffer jacket;

4

b. clothing and other articles that reflect evidence of THOMAS and DAPHNE KASPEREK having participated in the unlawful activity at the U.S. Capitol, including evidence of pepper spray or other non-lethal crowd control remnants;

c. Other paraphernalia used by or associated with THOMAS and DAPHNE KASPEREK's involvement on January 6, 2021;

3.      Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of conspirators and potential witnesses of violations of the TARGET OFFENSES.

4.      Records and information—including but not limited to documents, communications, emails, online postings, photographs, videos, calendars, itineraries, receipts, and financial statements—relating to:

a. THOMAS and DAPHNE KASPEREK's presence at the January 6, 2021 riot;

b. Any physical records, such as receipts for travel, which may serve to prove evidence of travel of to or from Washington D.C. from November 2020 through January 2021;

c. THOMAS and DAPHNE KASPEREK's motive and intent for traveling to the U.S. Capitol on or about January 6, 2021; and

d. THOMAS and DAPHNE KASPEREK's activities in and around Washington, D.C., specifically the U.S. Capitol, on or about January 6, 2021.

5.      Photographs, in particular, photographs of THOMAS and DAPHNE KASPEREK's, co-conspirators, or events in Washington D.C. on January 6, 2021, which constitute evidence of the TARGET OFFENSES.

6.      Evidence of relationships between members of a conspiracy, including evidence of identification and evidence of motivation to engage in TARGET OFFENSES.

7.      Cellphones, SIM cards, computers, laptops, tablets, CDs/DVDs, hard drives, and electronic store devices, and receipts reflecting THOMAS and DAPHNE KASPEREK's ownership and use, which contain records of the commission of the TARGET OFFENSES.

8.      Safes, both combination and key type, and their contents, which can contain evidence of the commission of the TARGET OFFENSES.

9.      Indicia of ownership, including, receipts, invoices, bills, canceled envelopes, and keys, which provides evidence of identity as to individuals committing the TARGET OFFENSES; and

10.      For any digital device capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above (hereinafter "the Device(s)"):

a.      evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

b.      evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

6

    c.   evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

    d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

    e.   evidence of the times the Device(s) was used;

    f.   passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

    g.   documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

    h.   records of or information about Internet Protocol addresses used by the Device(s);

    i.   records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.